UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHRISTOPHER JAMES,

       Petitioner,

                           CASE NO. 2:07-CV-14078

v.                        JUDGE DAVID M. LAWSON

                           MAGISTRATE JUDGE PAUL J. KOMIVES

BLAINE LAFLER,

       Respondent.

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    D.    *Weight and Sufficiency of the Evidence (Claims I & II)* . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        1.    *Weight of the Evidence (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.    *Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
             a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
             b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    E.    *Missing Witnesses (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        1.    *Missing Witnesses Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        2.    *Jury Instruction Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    F.    *Prosecutorial Misconduct* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
             a. Disparaging Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
             b. Evoking Sympathy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    G.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . 25
        1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    H.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should grant petitioner a certificate of appealability with respect to his sufficiency of the evidence claim, and deny a certificate of appealability with respect to petitioner's remaining claims.

II.   <u>REPORT</u>:

A.    *Procedural History*

1.    Petitioner Christopher James is a state prisoner, currently confined at the St. Louis Correctional Facility in St. Louis, Michigan.

2.    On July 13, 2004, petitioner was convicted of first degree premeditated murder, MICH. COMP. LAWS § 750.316(1); felon in possession of a firearm, MICH. COMP. LAWS § 750.224f; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Wayne County Circuit Court.  On August 19, 2004, he was sentenced to a suspended sentence on the felon in possession conviction, to a mandatory term of life imprisonment without possibility of parole on the murder conviction, and to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

> I.    APPELLANT'S CONVICTION FOR FIRST DEGREE MURDER SHOULD BE REVERSED AND THE CHARGE DISMISSED, AS THE PROSECUTION FAILED TO PRESENT LEGALLY SUFFICIENT EVIDENCE THAT MR. JAMES WAS EITHER THE PRINCIPAL TO OR AN AIDER AND ABETTOR TO PREMEDITATED HOMICIDES IN VIOLATION OF HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW.
>
> II.   APPELLANT'S CONVICTION FOR FIRST DEGREE PREMEDITATED MURDER MUST BE REVERSED BECAUSE IT WAS AGAINST THE

2

GREAT WEIGHT OF THE EVIDENCE.

III.   THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO CONDUCT A HEARING TO DETERMINE WHETHER THE POLICE AND PROSECUTION USED DUE DILIGENCE IN SEEKING TO LOCATE AND PRODUCE WITNESSES KEVIN JACKSON AND LARRY HAMILTON, AND BY DENYING A DEFENSE REQUEST FOR AN INSTRUCTION THAT THE JURY HAD TO INFER THAT HAD THEY TESTIFIED THEIR TESTIMONY WOULD HAVE BEEN ADVERSE TO THE PROSECUTION.

IV.   THE PROSECUTOR VIOLATED APPELLANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY ENGAGING IN MISCONDUCT DURING CLOSING ARGUMENTS BY DISPARAGING DEFENSE COUNSEL AND DIRECTLY APPEALING FOR SYMPATHY.  IF TRIAL COUNSEL WAIVED THE ERROR BY FAILING TO OBJECT, HE DEPRIVED MR. JAMES OF EFFECTIVE ASSISTANCE.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. James*, No. 257585, 2005 WL 3506709 (Mich. Ct. App. Dec. 22, 2005) (per curiam).

4.     Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. James*, 474 Mich. 1130, 712 N.W.2d 503 (2006).

5.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on September 4, 2007.  As grounds for the writ of habeas corpus, he raises the four claims that he raised in the state courts.

6.     Respondent filed his answer on April 8, 2008.  He contends that petitioner's claims are without merit or not cognizable on habeas review.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner was charged with first degree murder in connection with the shooting death of Leroy Goss.  Petitioner was tried jointly, before separate juries, with his co-defendant Deshawn

3

Brown.  The evidence adduced at trial was accurately summarized by the Michigan Court of

Appeals:

> The trial took place in July 2004 and was based on the fatal shooting of a
> man, Leroy Goss, in Detroit.  Dacia Robinson, James's former girlfriend, testified
> as follows: She and James were together at their home on August 2, 2002, when
> Brown came to the door around 11:00 p.m.  Brown arrived in a white, four-door car;
> a female was in the car and stayed there while Brown exited the vehicle.  Brown told
> James to get a gun because Brown "had got into it with someone on the block."
> James got the gun, an "AK-47," and the two men headed down an alley.  The alley
> led toward a vacant field, where Robinson could see five or six people gathered;
> Robinson heard screaming coming from the area.  It sounded to Robinson like Brown
> and James were arguing with someone, and then Robinson heard one gunshot,
> followed by four more in quick succession.
>
> Robinson stated that she did not see Brown or James fire a gun but that she
> saw a person fall to the ground and then saw Brown and James come back towards
> the house.  According to Robinson, James said, "I shot the n—ga," and James and
> Brown left in the white car after James put the gun in the trunk.  Robinson stated that
> James did not return home for about a month after the incident.  She further stated
> that when she saw James again, she asked him why he had shot the person, and he
> "just said I shot him."  Robinson admitted that she did not immediately tell the police
> about the shooting because she was scared that James would retaliate against her and
> her son.
>
> Camesha Jones testified that she was in the white car with Brown on the
> evening of August 2, 2002.  Jones stated that she and Brown saw about nine or ten
> people "jumping on" one person and beating him badly, that at some point Brown
> told the people to stop, and that Brown subsequently left to go to James's house.
> Jones testified that Brown and James came to the car several minutes later and that
> James spent a moment near the trunk of the car, which had been opened.  Jones
> stated that she did not see James or Brown holding a gun.  According to Jones, the
> three proceeded to a home on the east side of Detroit, Brown opened the trunk of the
> car, and James took something from the trunk.
>
> Leroy Goss, the victim's teenaged nephew and namesake, testified as
> follows: He was playing a game with some friends and relatives on the night in
> question when a drunk man, Larry Hamilton, came by and said "f—k y'all" to them.
> Someone went to tell the victim, who was also drunk, about Hamilton, and the victim
> appeared on the scene.  The victim tried telling Hamilton to be more respectful, after
> which Hamilton stated to the victim, "f—k your kids."  The victim then slapped
> Hamilton, and Goss and the others began beating Hamilton while they were all on the
> porch of a house near the vacant field.  Brown saw the commotion, yelled for
> them to stop the beating, and stated that he was going to get an AK-47.
>
> Goss testified that he and the people with him proceeded to the vacant field,
> leaving the beaten man behind, and that he then saw Brown, holding a gun, with

another person next to him. According to Goss, Brown stated, "Yo, what's up now n—er?" to the victim. Goss stated that Brown fired the gun and that he remembered hearing four or five gunshots.

James's attorney elicited that Goss's testimony at the preliminary examination suggested that he had not in fact seen another person next to Brown that night. The attorney also elicited that Goss had earlier stated to the police that Hamilton had struck the victim and thereby "started the fight." Goss admitted at trial that this statement was untrue. Brown's attorney elicited that, in his pretrial statement to the police, Goss stated that he saw Brown with the AK-47 but did not actually see him shoot it.

Piceese Frazier, Goss's teenaged cousin, testified that she witnessed the victim beating Hamilton on the night in question, that she and others joined in the beating, and that Brown swore at them and asked them why they were beating the man. Frazier testified that she saw Brown approach the porch where James was located and say "hand me my AK" to James. Brown's attorney elicited on cross-examination that parts of Frazier's pretrial statement to the police were inconsistent with her trial testimony.

Samantha Staton testified that she heard Hamilton making negative comments on the night in question and that someone told the victim about the comments. Staton indicated that Hamilton called the victim a "b—h," that the victim hit Hamilton, and that a number of teenagers then began beating Hamilton. Staton testified that Brown witnessed the beating and told them to stop and that Brown at some point asked James for a gun. According to Staton, Brown ran up to her group when they were in the vacant field and shot an AK-47 "at least eight times." Staton stated that James was behind Brown at the time of the shooting and that Brown and James both entered the white car after the shooting. On cross-examination, James's attorney elicited that Staton had denied beating Hamilton in a pretrial statement to the police and had also denied seeing the specific action of Brown shooting the victim (as opposed to just seeing Brown shooting in general).

Daniel Legette, the victim's teenaged son, testified that he went to get his father on the night in question because Hamilton had been harassing him and the people with him. Legette testified that the victim hit Hamilton and that the group then began beating Hamilton. Legette stated that Brown asked them to stop and that, when Legette and the others were in the vacant field, he saw Brown shooting the victim. Legette testified that he saw James on a porch with Brown before the shooting occurred but that he did not see another person with Brown at the time of the shooting. Brown's attorney elicited that Legette did not identify Brown at a pretrial lineup.

Eugene Fitzhugh, a Detroit police officer, testified that he found numerous shell casings along a street and in the alley near the vacant field and that he also found a knife near a dumpster that is located in the area. Fitzhugh indicated that the casings were from a pistol and not from an AK-47. Susan Smith, a Detroit police officer, testified that she examined seven shell casings from near the area of the shooting and determined that all seven had been fired from the same weapon, which

5

could not have been an AK-47.  She stated that she had no way to know when that weapon had been fired.  Smith further testified that a bullet fragment found by Fitzhugh was from a .30 caliber rifle and that an AK-47 was a .30 caliber rifle.

Cheryl Loewe, a medical examiner, testified that, according to an autopsy report completed by a colleague, the victim had sustained three gunshot wounds in his abdomen.  She also testified that the victim had been intoxicated at the time of his death.

Christopher Vintevoghel, a Detroit police officer, testified that, on February 3, 2004, he met with James.  According to Vintevoghel, James indicated the following: On the night in question, Brown came to the house where James was sleeping to tell him that a man was being beaten and that he needed a gun.  Brown was "hyped."  James went to the garage and showed Brown the gun.  James thought Brown wanted only to scare the people committing the beating.  Brown ran down an alley, and James heard several shots, after which Brown came back and said, "I got that n—ga."  James put the gun in a white car and he, Brown, and Brown's girlfriend left the scene.  Brown later told James that he had disposed of the gun.

Brown's statement to police made on February 10, 2004, was read into the record in front of Brown's jury only.  In the statement, Brown indicated that he observed the beating on the night in question and asked the beaters to stop.  He denied getting a gun or participating in a shooting that night.

Defendants presented no witnesses.  James's jury convicted him of first-degree premeditated murder, felon in possession of a firearm, and felony-firearm.  Brown's jury convicted him of second-degree murder, felon in possession of a firearm, and felony-firearm.

*James*, 2005 WL 3506709, at *1-*3, slip op. at 1-4.

C.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court
of the United States; or
        (2) resulted in a decision that was based on an unreasonable determination
of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535

U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

However, "[i]n order for a federal court to find a state court's application of [Supreme Court]

precedent 'unreasonable,' the state court's decision must have been more than incorrect or

erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539

U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of

whether the state court's decision comports with "clearly established federal law as determined by

the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the

Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the

holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Weight and Sufficiency of the Evidence (Claims I & II)*

In his first two claims, petitioner contends that the verdict was against the great weight of the evidence and that the evidence was insufficient to prove his guilt beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Weight of the Evidence (Claim II)*

In his second claim, petitioner argues that the jury's verdict was against the great weight of the evidence. The Court should conclude that this claim is not cognizable on habeas review. It is

well established that habeas review is not available to correct errors of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws.").  The federal constitution requires only that the evidence be sufficient to sustain the conviction under the standard established in *Jackson v. Virginia, infra*. Where the evidence is sufficient as a matter of due process, a claim that the verdict was against the weight of the evidence presents a state law issue which is not cognizable on habeas review.  *See Douglas v. Hendricks*, 236 F. Supp. 2d 412, 435-36 (D.N.J. 2002); *Dell v. Straub*, 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002) (Friedman, J.); *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001); *cf. Tibbs v. Florida*, 457 U.S. 31, 44 (1982) (noting in a different context that "trial and appellate judges commonly distinguish between weight and sufficiency of the evidence.").  In short, "[a] federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight of the evidence.'"  *Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985).

Thus, the only question here is whether the evidence was constitutionally sufficient to prove all the elements of the offense for which petitioner was convicted beyond a reasonable doubt.

2.    *Sufficiency of the Evidence (Claim I)*

Petitioner contends that the evidence was insufficient to sustain his conviction for first degree murder because the prosecution presented insufficient evidence that he intended to kill the victim or knew that Brown intended to kill the victim.  Although petitioner's claim presents a very close and difficult issue, in light of the deferential standards of review involved the Court should

conclude that petitioner is not entitled to habeas relief on this claim.

*a. Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197,

211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691

(1975). Thus, "[a] federal court must look to state law to determine the elements of the crime."

*Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, first degree murder includes any "[m]urder perpetrated by means of

poison, lying in wait, or any other willful, deliberate, and premeditated killing." Mich. Comp. Laws

§ 750.316(1). Thus, "[i]n order to convict a defendant of first-degree murder, the prosecution must

prove that the defendant intentionally killed the victim and that the act of killing was premeditated

and deliberate." *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780, 786 (1995); *see*

*also*, *Grant v. Rivers*, 920 F. Supp. 769, 786 (E.D. Mich. 1996); *People v. Younger*, 380 Mich. 678,

681, 158 N.W.2d 493, 495 (1968); *People v. Brown*, 137 Mich. App. 396, 407, 358 N.W.2d 592, 597

(1984). Further, Mich. Comp. Laws § 767.39 abolished the common law distinction between

aiders and abettors and principals, and provides that aiders and abettors may be prosecuted and

convicted as though they had directly participated in the crime. *See People v. Palmer*, 392 Mich.

370, 378, 220 N.W.2d 393, 396 (1974). Aiding and abetting under Michigan law requires proof of

three elements: (1) commission of the underlying crime either by the defendant or some other

person; (2) acts or encouragement by the defendant which aided or assisted the commission of the

crime; and (3) intent on the part of the defendant to commit the crime or knowledge by the defendant

that the principle intended to commit the crime at the time aid or encouragement was given. *See*

*People v. Acosta*, 153 Mich. App. 504, 511-12, 396 N.W.2d 463, 467 (1986) (per curiam). Thus,

"[t]o be convicted of aiding and abetting first-degree [premeditated] murder, the defendant must

have had the intent to kill or have given the aid knowing the principal possessed the intent to kill."

*People v. Buck*, 197 Mich. App. 404, 410, 496 N.W.2d 321, 326 (1992), *rev'd on other grounds sub*

11

*nom. People v. Holcomb*, 444 Mich. 853, 508 N.W.2d 502 (1993); *see Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (to establish aiding and abetting under Michigan law, "the prosecution must establish that the aider and abettor himself possessed the required intent or participated while knowing that the principal possessed the required intent.").

*b. Analysis*

In rejecting petitioner's sufficiency of the evidence claim, the Michigan Court of Appeals first explained that the evidence was sufficient to establish that Brown acted with the premeditated intent to kill, and that petitioner assisted Brown by providing to him the AK-47 used in the shooting, thus establishing the first two elements of petitioner's liability as an aider and abettor. *See James*, 2005 WL 3506709, at *4. Petitioner does not argue that the evidence was insufficient with respect to these two elements. Rather, petitioner contends that the evidence was insufficient to establish that he either intended to kill anyone or knew that Brown intended to kill anyone at the time he gave Brown the gun. In rejecting this claim, the Michigan Court of Appeals focused on two facts which, it concluded, provided sufficient evidence to establish petitioner's intent or knowledge of Brown's intent: (1) that fact that petitioner gave the gun to Brown while Brown was "hyped" and while some sort of altercation was going on; and (2) Leroy Goss's testimony that petitioner was in the alley and encouraged Brown to shoot the victim. *See id.*

The first fact relied upon by the court of appeals provides scant evidence that petitioner intended to kill or knew that Brown intended to kill. The prosecution witnesses uniformly testified that they witnessed Brown walk up the porch to petitioner's door and shout for petitioner to give him his "AK" or gun. *See* Trial Tr., dated 7/8/04, at 71-72; 133-34; 181. None of these witnesses testified that there was any other conversation between Brown and petitioner. In his statement to

the police, petitioner did indicate that Brown told him a bunch of people were beating someone up. *See id*., dated 7/12/04, at 126.  Further, Dacia Robinson, petitioner's (at the time) girlfriend who was present at the home, testified that Brown told petitioner he had "got into it with someone." *Id*., dated 7/7/04, at 98.[1]  However, nothing in the testimony of any witness suggests that Brown indicated to petitioner that he intended to kill anyone.  Nothing in the evidence presented contradicts petitioner's assertion in his police statement that he thought Brown was merely going to scare away the assailants involved in the assault of Hamilton.  *See id*., dated 7/12/04, at 127.  While petitioner providing the gun to Brown while Brown was "hyped" may have exhibited on petitioner's part a reckless disregard for the consequences of giving Brown the gun, this would only have supported a conviction for aiding and abetting second degree murder.  *Cf. People v. Kelly*, 423 Mich. 261, 278-79, 378 N.W.2d 365, 372-73 (1985) (where defendant acts with wanton and willful disregard of the likelihood that his acts of aid or encouragement will cause death or great bodily harm, defendant is guilty of aiding and abetting second degree murder).  Evidence that petitioner acted recklessly does not suffice to establish his guilt of first degree murder as an aider or abettor, nor does it give rise to any inference that petitioner intended to kill or knew that Brown intended to kill.

The sufficiency question, therefore, comes down to the evidence placing petitioner at the scene of the shooting and providing encouragement to Brown at that time.  This evidence came from two witnesses: Dacia Robinson, petitioner's then-girlfriend; and Leroy Goss, the victim's nephew.  The record, however, provides strong reason to conclude that these witnesses were simply not credible.  Beginning with Robinson, her testimony was highly suspect for two reasons.  First, she

---

[1]For reasons discussed below, there is considerable basis to question the veracity of Robinson's entire testimony.  Even assuming her testimony was true, however, the testimony regarding the reason why Brown wanted a gun provides little support for a finding that petitioner intended to kill or knew that Brown intended to do so.

13

testified that, from an observation point in her front yard, she saw petitioner walk down the alley with Brown and that she could see the two of them at the vacant field.  In her testimony, she indicated that the two never left her sight.  *See* Trial Tr., dated 7/7/04, at 102, 104.  Yet, and despite her protests to the contrary, it was fairly well established during her own cross-examination and during the testimony of Officers Rivard and Fitzhugh that the lighting conditions, placement of the houses, overgrown vegetation in the alley, and a large tree would have made it impossible for Robinson to have seen petitioner from the vantage point at which she claimed to have been located.  *See id*. at 122-23; *id*., dated 7/12/04, at 18-19, 52-53.  Second, Robinson testified that petitioner was in possession of the gun the entire time, and that he admitted to having shot the victim both when he came out of the alley and about one month later.  *See id*., dated 7/7/04, at 107, 110.  This contradicted the testimony of every single prosecution witness–who were friends or relatives of the victim and not inclined to favor petitioner in their testimony–each of whom unequivocally testified that Brown shot the victim.  Indeed, even the prosecutor never suggested that petitioner was the shooter or argued that the jury could convict him on this basis.  *See id*., dated 7/13/04, at 87-88, 91.

Turning to Leroy Goss, the victim's nephew who was 14 years old at the time of the shooting, he testified that petitioner was in the alley with Brown and encouraged Brown to shoot. Again, however, Goss's testimony strains credulity.  At trial, Goss initially testified that he could see someone else with Brown, but could not identify that person.  *See id*., dated 7/7/04, at 193, 240. Later, after an overnight recess and in response to a leading question from the prosecutor on redirect examination, Goss positively identified petitioner as the person with Brown, although he then immediately retracted this identification.  *See id*., dated 7/8/04, at 41-42.  Goss's testimony regarding the presence of another person with Brown contradicted his preliminary examination testimony, in

14

which he explicitly denied that anyone was with Brown in the alley.  *See id.*, dated 7/7/04, at 241-45; *id.*, dated 7/8/04, at 15-16.  His testimony also contradicted the unanimous testimony of the other witnesses, also friends or relatives of the victim, who testified that they did not see any one in the alley with Brown.  *See id.*, at 74-75, 94-95 (Piceese Frazier); 135-36 (Samantha Staton); 186-87, 189, 190 (Daniel Legette).

The Michigan Court of Appeals also found it significant that Goss testified that the person with Brown encouraged Brown to shoot.  However, again this testimony contradicted the testimony of every other prosecution witness, as well as the testimony of Goss at the preliminary examination, in which he explicitly denied that any one encouraged Brown to shoot.  *See id.* at 17-18.  Further, in describing the events beginning with his seeing Brown in the alley and ending with the shots being fired during direct examination, Goss did not once mention or suggest that anyone said anything to encourage Brown to shoot.  *See id.*, dated 7/7/04, at 193-202.  This testimony came only after the overnight recess during Goss's testimony.  And it is not clear that Goss's testimony actually implicated the other person who claimed to be in the alley with Brown.  Petitioner's counsel asked Brown: "You saw was that person encouraging him to shoot?"  Goss responded: "*They* was just saying get that nigger."  *Id.*, dated 7/8/04, at 14 (emphasis added).  From the pronoun "they" it is not clear who, exactly, Goss is identifying as the speaker.  Shortly thereafter, however, Goss claimed to have heard only one statement in the alley: "All I've said was he said, yeah, what's up now and shot.  *That's [the] only thing I heard.  That's [the] only words that was said that I heard coming from someone else['s] voice*."  *Id.* at 18 (emphasis added).  And each of the other witnesses present in the alley testified that Brown said something to the effect of "what up now" immediately before firing the gun.  *See id.* at 75 (Frazier), 138 (Staton), 182 (Legette).

15

This evidence, and the significant problems in the testimony of Robinson and Goss, makes this a difficult case.  Were I on petitioner' jury, this evidence would not have caused me to vote to convict petitioner of first degree murder on an aiding and abetting theory.  Likewise, were I the state trial or appellate judge, this record would have caused me to reverse petitioner's conviction based on his great weight of the evidence claim.  This is particularly true in light of the fact that petitioner's indisputably more culpable co-defendant was convicted of only second degree murder.  However, this Court is neither petitioner's jury nor a state court reviewing the conviction on direct appeal.  Rather, this Court is a federal habeas court constrained by the deferential standard of review set forth in the AEDPA, as applied to the Michigan Court of Appeal's application of the already deferential standard of review applicable to sufficiency of the evidence claims under *Jackson*.  And it is well-established that it is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution.  *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story.").  (internal citations, quotation marks and alterations omitted). A reviewing court may reverse a jury's credibility determinations only where the testimony is incredible as a matter of law, "such as where it was physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all."  *United States v. Radziszewski*, 474 F.3d 480, 485 (7th Cir. 2007) (internal quotation omitted); *accord United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009); *United States v. Gadison*, 8 F.3d 186, 190 (5th Cir. 1993).

16

Here, Goss's testimony is not facially incredible in that it was physically impossible for him to have observed what he claims occurred or was impossible under the laws of nature.  The fact that his testimony was inconsistent with his prior testimony and with the other witnesses does not render the testimony incredible on its face.  *See United States v. Patterson*, 23 F.3d 1239, 1244 n.5 (7th Cir. 1994).  This being the case, it cannot be said that the Michigan Court of Appeals's rejection of petitioner's sufficiency of the evidence claim was unreasonable.  If believed, Goss's testimony established that petitioner was in the alley with Brown, and encouraged him to shoot the victim. Coupled with the other evidence that petitioner gave the gun to Brown and helped him dispose of it after the shooting, this testimony is sufficient to establish petitioner's guilt of first degree murder as an aider and abettor.  *See People v. Casper*, 25 Mich. App. 1, 7-8, 180 N.W.2d 906, 909 (1970). Accordingly, despite the significant problems in the testimony of Goss and Robinson, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Missing Witnesses (Claim III)*

Petitioner next contends that he was denied a fair trial by the prosecution's failure to produce at trial two witnesses–Kevin Jackson and Larry Hamilton–without a showing that the prosecution had exercised due diligence in attempting to locate them.  Petitioner also contends that he was denied a fair trial by the trial court's failure to give an adverse inference instruction regarding the missing witnesses.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Missing Witnesses Claim*

To the extent petitioner contends he is entitled to habeas relief based on the prosecution's failure to produce Kevin Jackson and Larry Hamilton for trial, his claim is without merit.

17

It is true that, at the time of petitioner's trial, Michigan law required a prosecutor to list all *res gestae* witnesses. *See* MICH. COMP. LAWS §§ 767.40-.40a; *see also, People v. Jones*, 641 Mich. App. 659, 236 N.W.2d 531 (1975); *People v. Anderson*, 64 Mich. App. 218, 235 N.W.2d 746 (1975). Under Michigan law, a *res gestae* witness is "one who was an eyewitness to some event in the continuum of a criminal transaction and whose testimony will aid in developing a full disclosure of the facts surrounding the alleged commission of the charged offense." *People v. Hadley*, 67 Mich. App. 688, 690, 242 N.W.2d 32, 34 (1976). The statute does not, however, require the prosecutor to call all listed witnesses. In any event, any failure of the prosecutor with respect to a *res gestae* witness raises solely a claim of state law. It is well established that errors of state law do not provide a basis for habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Thus, petitioner's claim that the prosecutor violated state law regarding the production of res gestae witnesses is not cognizable on habeas review. *See Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 601 (E.D. Mich. 2001) (Tarnow, J.).

Petitioner does not explicitly argue that the prosecutor's failure to produce these witnesses violated his rights under the Sixth Amendment's Confrontation and Compulsory Process Clauses. Regardless, any such claim would be without merit. The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor[.]" U.S. CONST. amend. VI. With respect to the Confrontation Clause, under the Sixth Amendment "[a] defendant has no right to confront a 'witness' who provides no evidence at trial. Nor is the government required to call all of the witnesses to a crime." *United States v. Heck*, 499 F.2d 778,

18

789 n.9 (9th Cir. 1974) (citations omitted) (internal quotation omitted); *see also, United States v.Bryant*, 461 F.2d 912, 916 (6th Cir. 1972); *United States v. Polisi*, 416 F.2d 573, 579 (2d Cir. 1969); *Mitchell v. United States*, 359 F.2d 833, 836 n.3 (7th Cir. 1966). For this reason, the Sixth Circuit and Judges of this Court have repeatedly found that the prosecution's failure to endorse or call a *res gestae* witness in accordance with Michigan law does not raise a constitutional claim cognizable on habeas review. *See, e.g., Smith v. Elo*, No. 98-1977, 1999 WL 1045877, at *2 (6th Cir. Nov. 8, 1999); *Moreno v. Witbrow*, No. 94-1466, 1995 WL 428407, at No. 94-1466, 1995 WL 428407, at *1 (6th Cir. July 19, 1995) (per curiam); *Lewis v. Jake*, No. 88-1522, 1989 WL 145895, at *3 (6th Cir. Dec. 4, 1989) (per curiam); *Atkins v. Foltz*, No. 87-1341, 1988 WL 87710, at *2 (6th Cir. Aug. 24, 1988) (per curiam); *Johnson*, 159 F. Supp. 2d at 601.

With respect to the Compulsory Process Clause, as a general matter that Clause "grants a criminal defendant the right to call witnesses that are 'material and favorable to his defense." *Wong v. Money*, 142 F.3d 313, 324 (6th Cir. 1998) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Unfortunately, the Supreme Court has provided little guidance on the exact contours of the Compulsory Process Clause. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 55 & n. 12 (1987) (noting that the Compulsory Process Clause has rarely been a factor in the Court's decisions). Nevertheless, some general principles do exist to guide the Court's determination. First, as a general matter the clause establishes, "at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Id.* at 56. Second, it is clear that the right to compulsory process is not absolute; thus, in certain circumstances a witness may be precluded from testifying as a sanction for defendant's failing to comply with a discovery

19

order, *see Taylor v. Illinois*, 484 U.S. 400, 410-14 (1988), and testimony is subject to general evidentiary rules such as those governing relevance and privilege, *see Washington v. Texas*, 388 U.S. 14, 23 n.21 (1967); *Smith v. Cromer*, 159 F.3d 875, 882 (4th Cir. 1998).  Because petitioner never sought to present either Jackson or Hamilton as a witness, his right to present a defense was not violated.

To the extent that petitioner claims he was entitled to question these witnesses as a matter of the Compulsory Process Clause, this claim fails.  First, petitioner was not denied the court's assistance in locating these witnesses, nor when it became apparent at trial that the witnesses existed did he request a continuance to locate the witnesses and the court's assistance in doing so.  *See Green v. Estelle*, 488 F.2d 918, 920 (5th Cir. 1973) (no denial of compulsory process where defendant did not attempt to call witness or ask for a continuance to do so, and the "state court was left totally unaware of the defendant's desire to call" the witness); *United States v. Mickens*, 837 F. Supp. 745, 748 (S.D. W. Va. 1993), *aff'd*, 53 F.3d 329 (4th Cir. 1995).  Further, as the Supreme Court has explained, "more than mere absence of testimony is necessary to establish a violation of the right [to compulsory process]."  *United States v. Valenzuela-Bernal*, 458 U.S. 858, 866 (1982).  The Sixth Amendment does not provide a defendant the right to process for obtaining any witness, only "witnesses in his favor."  U.S. CONST. amend. VI.  "This language suggests that [a defendant] cannot establish a violation of his constitutional right to compulsory process merely by showing that [he was deprived of witnesses' testimony].  He must at least make some plausible showing of how their testimony would have been both material and noncumulative evidence in support of his defense.  *See Valenzuela-Bernal*, 458 U.S. at 873 (defendant must show that the evidence "would have been material and favorable in ways not merely cumulative to the testimony of available

20

witnesses."). Petitioner has failed to show what favorable evidence these witnesses would have provided, other than cumulative evidence regarding the beating of Hamilton or his absence form the alley at the time of the shooting. Because the other witnesses provided extensive testimony regarding these matters, petitioner cannot show that the testimony of Jackson or Hamilton would have provided material, noncumulative evidence in his favor. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

> 2. *Jury Instruction Claim*

Petitioner also contends that the trial court erred in failing to instruct the jury that it could draw an adverse inference against the prosecution based on their failure to produce Hamilton and Jackson at trial. This claim fails for two reasons.

First, petitioner did not request an adverse inference instruction. The failure of a trial court to give an unrequested instruction *sua sponte* does not raise a constitutional claim cognizable on habeas review. *See Manning v. Rose*, 507 F.2d 889, 895 (6th Cir. 1974); *Peoples v. Hocker*, 423 F.2d 960, 963 (9th Cir. 1970). Second, petitioner cannot show that he was prejudiced by the absence of an adverse witness instruction because the adverse inference to be drawn from the failure to the prosecutor to produce the witnesses–that Hamilton was assaulted and that petitioner was not present in the alley–was fully developed through the testimony of the witnesses the prosecution did produce at trial. Thus, the adverse inference would have been cumulative to the evidence presented. *See Beverly v. Walker*, 899 F. Supp. 900, 913-14 (N.D.N.Y. 1995), *aff'd*, 118 F.3d 900 (2d Cir. 1997). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Prosecutorial Misconduct*

Finally, petitioner contends that he was denied a fair trial by prosecutorial misconduct at his

trial.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

      1.     *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id*. (internal quotation omitted).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused."  *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted).  In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial."  *Id*. (internal quotation omitted).

      2.     *Analysis*

      *a. Disparaging Defense*

Petitioner first contends that the prosecutor improperly disparaged his defense and defense counsel.  In response to counsel's argument that petitioner was guilty only of being a felon in possession of a firearm, the prosecutor argued on rebuttal: "First of all, your Honor, there need[s] to be put on the record there was a blatant mischaracterization of the law.  Counsel is fully aware that if someone is guilty of felon in possession of a firearm, they're equally guilty of felony firearm.

For him to even argue that I think is contemptible." Trial Tr., dated 7/13/04, at 120.  The prosecutor also commented on the extensive testimony and argument relating to the assault of Hamilton: "[Y]ou know, basically there is things that happen in a trial that you're going to call, consider red herrings. You know, that smoking mirrors [sic] trick that brings so much sympathy on Mr. Hamilton that we forget about the fact that man lost his life in this case." *Id*. at 121.  The Michigan Court of Appeals rejected petitioner's claim, concluding that the prosecutor's comments were fair responses to defense counsel's closing argument.  The Court should conclude that this determination was reasonable.

An important factor in judging the propriety of a prosecutor's comments is whether the comment was "invited by or was responsive to the [closing argument] of the defense."  *Darden v. Wainwright*, 477 U.S. 168, 182 (1986); *see also*, *United States v. Young*, 470 U.S. 1, 12-13 (1985) (footnote omitted) ("If the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."); *United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994).  Here, the prosecutor's comments were a fair response to counsel's arguments focusing on the beating of Hamilton and that petitioner was guilty of only being a felon in possession of a firearm.  As such, they were not improper.  Further, as the Sixth Circuit has noted "[a] prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for truth."  *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992).  Thus, the prosecutor's comments regarding "red herrings" and "smoke and mirrors" did not deprive petitioner of a fair trial.  *See United States v. Catlett*, 97 F.3d 565, 572 (D.C. Cir. 1996) (prosecutor's comparison of defense counsel's attempts to divert jurors' attention from facts of case with pickpocket's diversion of his victim's attention  was neither improper nor

prejudicial); *United States v. Castro*, 89 F.3d 1443, 1457 (11th Cir. 1996) (no denial of due process where prosecutor stated: "These defense counsel, they represent their clients, they come in here and say what they want to help their clients."); *United States v. Emenogha*, 1 F.3d 473, 481 (7th Cir. 1993) (trial was not fundamentally unfair where prosecutor disparaged defense counsel by stating: "Now, Ms. Carotheres went on at length about the evidence the government presented where there were no tapes of this, no videotapes of that, no da da da da, da da da. Well, can you imagine if we left the investigation of this case to a criminal defense attorney what kind of evidence we would have?"); *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992) (defendant not denied a fair trial by prosecutor's description of the defense as "ridiculous."). Accordingly, the Court should conclude that petitioner is not entitled to relief on this claim.

### b. Evoking Sympathy

Petitioner also contends that the prosecutor improperly appealed to the jury's sympathy by arguing that "Mr. Hamilton deserved a lot of sympathy in this case. He did not deserve what happened to him." Trial Tr., dated 7/13/04, at 121. The Court should reject this claim, for two reasons. First, defense counsel immediately objected to this comment, and in response to the objection the trial court instructed the jurors "not to have sympathy for either side." *Id*. Second, petitioner has not explained how this comment could possibly have resulted in prejudice. The prosecutor did not attempt to evoke sympathy for the victim, but rather for Hamilton, who was the victim of the assault perpetrated by the shooting victim. Any sympathy the jury might have had for Hamilton would have redounded to petitioner's benefit, as part of the defense case was that Brown was responding to a brutal assault by the victim and the prosecution witnesses on Hamilton. In these circumstances, petitioner cannot show that the prosecutor's comment deprived him of a fair trial.

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.[2]

G.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893

---

[2]Petitioner also contends that, if his prosecutorial misconduct claims are barred by his failure to object at trial, then counsel was ineffective for failing to object.  However, as discussed above petitioner's prosecutorial misconduct claims are meritless.  Thus, any objection would have been meritless, and counsel cannot be deemed ineffective for failing to raise a meritless objection.  *See Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993).

n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

    2.   *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should grant a certificate of appealability on petitioner's sufficiency of the evidence claim and deny a certificate of appealability on the remainder of petitioner's claims. With respect to petitioner's sufficiency of the evidence claim, as explained above the resolution of this claim is difficult in light of the severe credibility problems with the testimony of Goss and Robinson and the lack of any other evidence, beyond these two witnesses, showing that petitioner intended to kill

26

Leroy Goss or knew that Brown intended to do so. Although I conclude that the deferential standards of the AEDPA and *Jackson* preclude relief on this claim, this conclusion is certainly debatable among reasonable jurists. Thus, the Court should grant a certificate of appealability with respect to this claim.

With respect to the remainder of petitioner's claims, the Court should conclude that a certificate of appealability is not appropriate, for the reasons discussed above. It is well established that a weight of the evidence claim is not cognizable on habeas review, and thus the resolution of this claim is not reasonably debatable. Likewise, because it is clear that any testimony from Hamilton and Jackson would have been cumulative to the evidence presented at trial, the resolution of petitioner's missing witness claim is not reasonably debatable. Finally, because the prosecutor's comments were a fair response to defense counsel's arguments, and because they did not have an prejudicial effect, the resolution of petitioner's prosecutorial misconduct claims is not reasonably debatable. Accordingly, if the Court accepts my recommendation regarding the merits of the petition, the Court should grant a certificate of appealability with respect to petitioner's sufficiency of the evidence claim and deny the certificate with respect to petitioner's remaining claims.

H.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should grant petitioner a certificate of appealability with respect to his sufficiency of the evidence claim and deny a certificate of appealability with respect to petitioner's remaining claims.

III.        NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b).  Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives_____
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 12/17/09

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on December 17, 2009.

s/Eddrey Butts_____
Case Manager